# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01804-PAB-SBP

AKEEM THOMAS,

Plaintiff,

v.

EL PASO COUNTY, COLORADO, SHERIFF'S OFFICE,
SHERIFF JOE ROYBAL,
UNDERSHERIFF KRAMER,
COMMANDER CORNEL,
CHIEF DENO,
LT. WHEELER,
LT. DAVIS,
SGT. DELACRETEZ,
SGT. DELONG, and
DEP. CABLE,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

**Susan Prose, United States Magistrate Judge**

      This matter comes before the court on Defendants' Motion to Dismiss (the "Motion" or "Motion to Dismiss") (ECF No. 23) filed on February 2, 2024. This court considers the Motion pursuant to 28 U.S.C. § 636(b), the Order Referring Case dated November 13, 2023 (ECF No. 14), and the memorandum referring the Motion dated February 8, 2024 (ECF No. 24), and concludes that oral argument will not materially assist in the resolution of this matter. Having carefully considered Plaintiff's Amended Complaint (ECF No. 8), the Motion to Dismiss, and the applicable law, the undersigned respectfully **RECOMMENDS** that the Motion be **granted in part and denied in part**.

## BACKGROUND[1]

At the time of the events forming the basis of the claims brought by pro se Plaintiff
Akeem Thomas ("Plaintiff" or "Mr. Thomas") in this action, he was detained at the El Paso
County Criminal Justice Center ("CJC"). Am. Compl. at 7. On March 19, 2023, Defendant
Cable, a CJC deputy, and several other unnamed officers were conducting a search of Mr.
Thomas's cell in the D-1 ward of the CJC. *Id.* Mr. Thomas sat on a table near his cell while the
officers performed their search. *Id.* At some point, he observed officers "mishandling" his books
and asked why they were placing them in a bag. *Id.* When they did not respond, he demanded to
see an "AR"—which, though undefined in the pleading, the court understands to be the
commonly-used acronym for "administrative regulation," or prison policy[2]—and to talk to a
sergeant. *Id.*

At that point, Deputy Cable ordered Mr. Thomas to return to his cell. *Id.* Mr. Thomas did
not comply with this order but instead renewed his demand to speak with a sergeant. *Id.* ("***I told
[Cable] again*** to call his sergeant.") (emphasis added). In response to Mr. Thomas's demands,
Deputy Cable allegedly "got aggressive, began yelling and swearing at [Plaintiff], and
approached [him]." *Id.* Then, Deputy Cable "jump[ed]" on his back, causing Mr. Thomas to
stand up from the pain. *Id.* at 8.

---

[1] The court draws these facts from the Amended Complaint and presumes they are true for
purposes of this recommendation. *See, e.g.*, *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272,
1281 (10th Cir. 2021) (on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6),
the court must accept the plaintiff's well-pleaded facts as true and draw all reasonable inferences
form those facts in the plaintiff's favor).

[2] *See, e.g.*, *Estrada v. Smart*, 107 F.4th 1254, 1260 (10th Cir. 2024) (using acronym "AR" to refer
to a Colorado Department of Corrections administrative regulation).

With Mr. Thomas having arisen from his seated position and now standing up, Deputy Cable "knee struck him in his spine *trying* to get him to the ground[.]" *Id.* (emphasis added). But Deputy Cable did not succeed in taking Mr. Thomas to the ground. Instead, Mr. Thomas stood up, and at that point, Deputy Cable brought Mr. Thomas's hands behind his back—"chicken wing[ing]" him, as Mr. Thomas puts it—and he felt something "pop," which caused pain in his arm and spine. *Id.* Deputy Cable used his knee to put increased pressure on Mr. Thomas's spine. *Id.* Deputy Cable and the other officers then walked Mr. Thomas over to his cell and "threw" him in, resulting in a toe on his right foot "bust[ing] open." *Id.* "At no time" during the incident, says Mr. Thomas, "was [he] actively resisting this excessive use of force[.]" *Id.*

Immediately following this incident, Mr. Thomas experienced "rapidly increas[ing]" pain, prompting him to hit the emergency call button in his cell multiple times. *Id.* at 9. When Deputy Cable came to the cell, Mr. Thomas explained his symptoms and asked for medical attention. *Id.* According to Mr. Thomas, Deputy Cable said that he "did not care" and did not believe that Mr. Thomas was having a medical emergency. *Id.* Apparently Deputy Cable did not contact medical staff.

The Amended Complaint brings four claims based on these allegations. Mr. Thomas's two primary claims are against Deputy Cable, who is sued in both his individual and official capacities, for excessive force and deliberate indifference to serious medical needs. *Id.* at 6, 7-9. The two remaining claims are premised on theories of municipal liability against the El Paso County Sheriff's Office and the other individual Defendants, all of whom are Sheriff's Office officials (collectively, "EPSO Defendants"). Claim Three asserts that the EPSO Defendants violated Mr. Thomas's Fourteenth Amendment due process rights by implementing policies and

practices that authorize excessive force by the use of unconstitutional pain-compliance techniques. *Id.* at 10-11. In Claim Four, Mr. Thomas contends that Defendants Commander Carnell,[3] Lieutenant Wheeler, and Lieutenant Davis violated his Fourteenth Amendment due process rights by failing to provide proper training and supervision in the utilization of use-of-force techniques. *Id.* at 11. Mr. Thomas requests $7,000,000 in punitive damages from each Defendant, as well as the costs of his "arising medical bills" and physical therapy. *Id.* at 13.

In the Motion, Defendants seek dismissal of all claims under Federal Rule of Civil Procedure 12(b)(6). Mr. Thomas did not respond to the Motion and, hence, no reply was filed.[4] Although this court will not act as Mr. Thomas's advocate, it recognizes that "even if a plaintiff does not file a response to a motion to dismiss for failure to state a claim, the district court must still examine the allegations in the plaintiff's complaint and determine whether the plaintiff has stated a claim upon which relief can be granted." *Issa v. Comp USA*, 354 F.3d 1174, 1178 (10th Cir. 2003). The court undertakes that evaluation here.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference

---

[3] Defendants represent that Commander Carnell's name is misspelled in the case caption. Motion at 1 n.1.

[4] On January 22, 2024, Mr. Thomas changed his address of record. ECF No. 20. Defendants filed their Motion on February 2, 2024, and indicated to the court that they served a copy by mail upon Mr. Thomas using the updated address. Motion at 13. Recently, Mr. Thomas filed a notice of change of address, ECF No. 25, and did not mention Defendants' Motion.

that the defendant is liable for the misconduct alleged." *Id.*; *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claims "across the line from conceivable to plausible") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In making this determination, the "court accepts as true all well pleaded factual allegations in a complaint and views those allegations in the light most favorable to the plaintiff." *Straub v. BNSF Ry. Co.*, 909 F.3d 1280, 1287 (10th Cir. 2018).

Nevertheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. But "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (internal quotation marks omitted, quoting *Twombly*, 550 U.S. at 556), *reh'g en banc denied*, 83 F.4th 1251 (10th Cir. 2023).

In applying these principles, the court is mindful of Mr. Thomas's pro se status and therefore construes his filings liberally. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). But the court cannot act as a plaintiff's advocate, *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991), and must still apply the same procedural rules and substantive law to a pro se litigant as to a represented party. *See Murray v. City of Tahlequah*, 312 F.3d 1196, 1199 n.3 (10th Cir. 2002); *see also Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008) ("*Pro se* status does not excuse the obligation of any litigant to comply with the fundamental requirements of the Federal Rules of Civil and Appellate Procedure.") (citation and internal quotation marks omitted). Thus, while the court makes "some allowances" for a pro se plaintiff's "failure to cite proper legal authority, his

confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with the pleading requirements," the court "cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (cleaned up) (quoting *Hall*, 935 F.2d at 1110, internal quotation marks omitted)); *see also Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (cautioning that the court will not "construct arguments or theories for the [pro se] plaintiff in the absence of any discussion of those issues") (citation omitted).

## ANALYSIS

### I.    Claims Against Deputy Cable (Claims One and Two)

In these claims, Mr. Thomas asserts that Deputy Cable employed excessive force against him during the March 19, 2023 incident, and then exhibited deliberate indifference to his serious medical needs in the aftermath. The court begins by setting forth the legal principles governing the qualified immunity analysis, then addresses each claim, in turn.

### A.    Qualified Immunity Principles

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (internal quotation marks omitted)); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (under the doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known").

Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights.'" *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins*, 519 F.3d at 1249).

To overcome the defense, "the onus is on the plaintiff to demonstrate (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Surat v. Klamser*, 52 F.4th 1261, 1270-71 (10th Cir. 2022) (quotations omitted); *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (same). The court has "discretion to decide the order in which to engage the two prongs of the qualified immunity standard." *Andersen v. DelCore*, 79 F.4th 1153, 1163 (10th Cir. 2023) (cleaned up). Regardless of the order, "if the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense." *A.M. v. Holmes*, 830 F.3d 1123, 1134-35 (10th Cir. 2016); *see also Andersen*, 79 F.4th at 1163 (if the court "conclude[s] that the plaintiff has not met his burden as to either part of the two-prong inquiry, [the court] *must grant qualified immunity* to the defendant") (citing *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)) (emphasis added). "[T]he 'record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.'" *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877-78 (10th Cir. 2014) (quoting *Medina*, 252 F.3d at 1128).

An official's conduct violates clearly established law when, at the time of the challenged conduct, "the contours of a right are sufficiently clear that *every reasonable official* would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741

(2011) (cleaned up) (emphasis added). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *see also Pahls v. Thomas*, 718 F.3d 1210, 1227 (10th Cir. 2013) (qualified immunity, "by design, 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions'") (quoting *al-Kidd*, 563 U.S. at 743).

For the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision "on point," or the "weight of authority from other courts must have found the law to be as the plaintiff maintains." *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018) (quotation omitted). And the Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Est. of B.I.C. v. Gillen*, 761 F.3d 1099, 1106 (10th Cir. 2014) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). While a plaintiff is not required to cite a case with "identical facts" to demonstrate a clearly established right, *Kapinski v. City of Albuquerque*, 964 F.3d 900, 910 (10th Cir. 2020), clearly established law must place the constitutional issue "beyond debate." *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 563 U.S. at 741). It is the plaintiff's obligation to cite to cases that satisfy the burden of demonstrating the asserted law is clearly established. *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010) ("The plaintiff bears the burden of citing to us what he thinks constitutes clearly established law.").

### B.    Claim One: Excessive Force

In Claim One, Mr. Thomas claims a violation of his civil rights in connection with the

force used to return him to his cell after he refused to comply with Deputy Cable's direct order to do so.

Deputy Cable argues that he is entitled to qualified immunity because the force he employed during the March 19, 2023 incident was not excessive, but rather used to "maintain and/or restore discipline" when Mr. Thomas refused an order, and that "cases with similar facts" to those here "have regularly found that no excessive force was used." Motion at 5-6. The court respectfully agrees that Deputy Cable is entitled to qualified immunity on this claim.

### 1.    Constitutional Violation

"[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n. 10 (1989). Claims of excessive force brought by a pretrial detainee fall under the Due Process Clause of the Fourteenth Amendment. *Rowell v. Bd. of Cnty. Commr's of Muskogee Cnty.*, 978 F.3d 1166, 1171 (10th Cir. 2020). The Supreme Court has made clear that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). "A pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 397. In other words, after *Kingsley*, "there is no subjective element of an excessive-force claim brought by a pretrial detainee." *Colbruno v. Kessler*, 928 F.3d 1155, 1163 (10th Cir. 2019); *cf. Ullery v. Bradley*, 949 F.3d 1282, 1290 (10th Cir. 2020) (Eighth Amendment excessive force analysis includes an additional subjective prong: "whether the defendant acted with a sufficiently culpable state of mind") (quotation omitted). Therefore, for Mr. Thomas to plausibly allege a violation of his constitutional right to be free from excessive force, the well-pleaded facts "must only demonstrate that [Cable's]

conduct 'was objectively harmful enough to establish a constitutional violation.'" *See Brown v. Flowers*, 974 F.3d 1178, 1183 (2020) (quoting *Smith v. Cochran*, 339 F.3d 1205, 1212 (10th Cir. 2003) (other quotation omitted). Thus, "a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action *is not rationally related* to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley*, 576 U.S. at 398 (emphasis added).

"Objective reasonableness under *Kingsley* turns on the 'facts and circumstances of each particular case.'" *Rowell*, 978 F.3d at 1171 (quoting *Kingsley*, 576 U.S. at 397) (internal citation omitted). "In *Kingsley*, the Supreme Court listed non-exclusive factors that may bear on whether an officer's use of force on a pretrial detainee was objectively reasonable: (1) the relationship between the need for the use of force and the amount of force used, (2) the extent of the plaintiff's injury, (3) any effort made by the officer to temper or to limit the amount of force, (4) the severity of the security problem at issue, (5) the threat reasonably perceived by the officer, and (6) whether the plaintiff was actively resisting." *Id.* at 1171-72 (quoting *Kingsley*, 576 U.S. at 397) (internal citations and quotation marks omitted). Scrutinizing Mr. Thomas's allegations pursuant to the *Kingsley* factors, the court concludes that he has failed to plead a colorable excessive force claim.

On the facts alleged—affording them the maximum possible credit, as the court must at this stage—Mr. Thomas has not plausibly alleged that the force he describes bore no rational relationship to the legitimate governmental objective of maintaining security and order in the volatile environment of a prison housing unit.

First, and critically, Mr. Thomas makes clear that *he* initiated a disturbance in his housing

unit by challenging the authority of Deputy Cable and other CJC officers to conduct a routine search of his cell. Am. Compl. at 7. He asserts that he did not approve of the deputies' supposed "mishandling [his] personal books" during the cell shakedown and that he verbally challenged them, demanding to know "why they were taking [the books] in the first place." *Id.* There are no facts indicating the manner in which the books were being "mishandled," but regardless, "prisoners do not have any reasonable expectation of privacy in their prison cells or in articles that they have in their possession while in prison." *Miranda v. Little*, No. 20-cv-03004-NYW, 2022 WL 19419, at *5 (D. Colo. Jan. 3, 2022) (quoting *Reneau v. Mahoney*, No. 13-cv-0125-WJM-KMT, 2014 WL 1224734, at *3 (D. Colo. Mar. 25, 2014) (internal quotation marks omitted)). Even so, the facts allow the court to infer that Mr. Thomas was angry and expressed his anger at the correctional officers. And when he "didn't get an answer" from the deputies performing the cell search, his verbal aggression escalated: he demanded to see an "AR" (presumably, the CJC administrative regulation governing cell searches) and to talk with a sergeant (the deputies' superior officer). Am. Compl. at 7.

At that point, Deputy Cable issued an explicit order to Mr. Thomas, directing him to return to his cell. *Id.* But rather than obeying, Mr. Thomas turned the tables and issued his own order to Deputy Cable: "***I told him again*** to call his sergeant." *Id.* (emphasis added). Only then, in the face of Mr. Thomas's overt refusal to obey a command and his presumptiveness in issuing a countermanding order to a correctional officer, did Deputy Cable initiate measures to restore control. To do that, Deputy Cable put his knee in Mr. Thomas's back—recall that Mr. Thomas was sitting at the time—"trying," but failing, "to get [Mr. Thomas] to the ground." *Id.* at 8. At that point, faced with an unrestrained prisoner who wouldn't obey his orders, Deputy Cable

succeeded in forcing Mr. Thomas's arms behind him, resulting in them being thrust up and out to

his sides like "chicken wings"—a maneuver which then allowed a group of deputies to regain

sufficient control over Mr. Thomas to move him to his cell. *Id.* The reasonable inference to draw

from Mr. Thomas's allegations is that it took just moments for this move; Mr. Thomas was, after

all, sitting just outside his cell, watching the officers search it, when he disobeyed Deputy

Cable's order. While unpleasant for Mr. Thomas, this scenario of his own making does not

plausibly indicate the absence of a rational connection between the force utilized and the

legitimate governmental objective of maintaining security in a dangerous prison environment.

*See Kingsley*, 576 U.S. at 398.

The court reasonably infers from the facts that Deputy Cable immediately recognized that

Mr. Thomas's resistance to obeying a correctional officer's order posed a serious threat to prison

security—a legitimate governmental objective "central to all other corrections goals." *Jones v.

Salt Lake Cnty.*, 503 F.3d 1147, 1156 (10th Cir. 2007) (quoting *Thornburgh v. Abbott*, 490 U.S.

401, 415 (1989)) (internal quotation marks omitted). Mr. Thomas's direct refusal to comply with

Deputy Cable's order risked inciting other prisoners to do the same (among many other obvious

risks associated with such disobedient behavior),[5] and Deputy Cable rationally took action to

prevent Plaintiff's disobedience from triggering chaos in a prison housing unit. In this context,

there was a clear need for force. As the Tenth Circuit has emphasized, "prisoners cannot be

permitted to decide which orders they will obey, and when they will obey them." *Redmond v.

Crowther*, 882 F.3d 927, 937-38 (10th Cir. 2018) (quotation omitted) (holding that there was a

---

[5] Mr. Thomas does not allege that he was housed in an area separate from other prisoners, such
as an administrative segregation unit.

need to use force in response to an inmate's locking himself inside a recreation yard and refusing to comply with prison officials' orders); *see also, e.g.*, *Nosewicz v. Janosko*, 754 F. App'x 725, 734 (10th Cir. 2018) ("If Nosewicz refused to obey a command to leave the cell, such refusal would have justified Janosko's use of physical force to effectuate his removal from the cell."); *Stevenson v. Cordova*, No. 14-cv-00649-CBS, 2016 WL 5791243, at *21 (D. Colo. Oct. 4, 2016) ("Mr. Stevenson may have felt that Defendants Clinkinbeard's response to his earlier disagreement with Officer Meyers was unreasonable or inappropriate, but that did not give him the right to refuse a lawful command. While all prisoners are entitled to Eighth Amendment protections against excessive use of force, inmates do not have a right to call the shots when it relates to obedience to lawful commands from the officers.") (cleaned up).

Further, the well-pleaded facts evince a rational connection between the risks Mr. Thomas posed and the amount of force employed to defuse those risks. Indeed, Mr. Thomas's own allegations place that force squarely within the realm of the reasonable and not excessive. After trying—and failing—to put Mr. Thomas on the ground, Deputy Cable managed to secure Mr. Thomas's arms so that he could be moved to his cell without harming the deputies. There are no allegations plausibly suggesting that the force utilized here was wholly gratuitous in nature, or that it bore no connection to an attempt to restore order by regaining control over a prisoner who had flouted the orders of a correctional officer. Deputy Cable is not alleged to have engaged in actions that may have indicated otherwise: he did not strike Mr. Thomas on any part of his body; he did not bang his head against the floor; and he did not kick him. *Cf. Nosewicz*, 754 F. App'x at 734 (refusing to obey an order "would not have justified banging [inmate's] head into the wall and hitting him with enough force to break his ribs").

In this context, which admits of no doubt that force was needed, the facts show that Deputy Cable made an effort "to temper or to limit the amount of force" employed. *Kinglsey*, 576 U.S. at 397. While Mr. Thomas claims not to have been resisting *during the application of the force*, Am. Compl. at 8—a contention the court accepts, though belied by Deputy Cable's inability to get Mr. Thomas to the ground—that is beside the point. The well-pleaded facts show that force was utilized because Mr. Thomas would not obey a correctional officer's legitimate order to move to a different location. This is "resistance"—even if not physical in nature— justifying the employment of force.

Finally, Mr. Thomas's assertion that "[t]here was no need for any force at all," *id.*, is a conclusory statement not entitled to the presumption of truth, particularly so under circumstances where the facts alleged establish that a prisoner sought to shift the balance of power between correctional staff and himself by interfering with a routine cell search, refusing to comply with a legitimate order, and purporting to elevate himself to a position of dictating the actions of correctional personnel. These facts do not plausibly indicate that the force Deputy Cable chose to employ to defuse these risks lacked a rational relationship to the legitimate correctional goal of maintaining order in a prison housing unit. While Mr. Thomas alleges some injury from the force employed—any use of force carries with it the risk of injury—the facts here plausibly establish that Deputy Cable reasonably applied the amount of force necessary to subdue Mr. Thomas as the situation escalated.

In sum, having evaluated the well-pleaded facts here pursuant to the *Kingsley* factors, the court finds that Mr. Thomas has alleged no colorable excessive force claim against Deputy Cable. Deputy Cable, therefore, is entitled to qualified immunity on that basis alone.

### 2.    Clearly Established Law

However, even assuming that Mr. Thomas had adequately alleged an excessive force claim against Deputy Cable, the court finds that such a claim fails on the second prong of the qualified immunity analysis, i.e., whether a clearly established constitutional right was violated on March 19, 2023—the day that force was used in response to Mr. Thomas's refusal to comply with an order to return to his cell.

Mr. Thomas did not respond to the Motion to Dismiss and so has adduced no Tenth Circuit or Supreme Court precedent, or pointed to a clear weight of authority from other courts, clearly establishing that the force Deputy Cable employed was unlawful under the circumstances he faced. Regardless, this court has undertaken a search for such law and found none.[6]

As noted above, the law *is* clearly established that Mr. Thomas had no right to avoid force following his refusal to obey Deputy Cable's order. *See, e.g.*, *Redmond*, 882 F.3d at 937-38. The more particular question, though, is whether there is Supreme Court or Tenth Circuit case law making it clear to all reasonable correctional officials, with no room for debate, that the specific force Deputy Cable used was unconstitutional. Mr. Thomas did not merely refuse to

---

[6] The burden to point to clearly established law, while typically resting with the plaintiff, does not prevent this court from attempting to locate a case clearly establishing the pertinent law. The court deems it appropriate to do so here, where Mr. Thomas is proceeding pro se. Indeed, "the Tenth Circuit has reversed a trial court's dismissal of a pro se plaintiff's excessive force claim— by itself pointing to a Supreme Court case sufficiently similar to the facts alleged and finding the plaintiff's right was clearly established." *McKenzie v. City & Cnty. of Denver*, No. 21-cv-00833-PAB-STV, 2023 WL 5488465, at *6 (D. Colo. July 21, 2023), *report and recommendation adopted*, No. 21-cv-00833-PAB-STV, 2023 WL 5485625 (D. Colo. Aug. 24, 2023) (citing *Ali v. Duboise*, 763 F. App'x 645, 651–52 (10th Cir. 2019)). In *McKenzie*, the court "conducted additional inquiry as appropriate to determine whether the relevant laws of Plaintiff's claims were clearly established as of the dates of these events." *Id.* So does the court here.

obey an order; his rejoinder to that order was to issue his own countermanding order to Deputy

Cable while sitting in an open area of a housing range in a jail occupied by many prisoners. This

court has located no precedent, of sufficient particularity and specificity, to have provided clarity

beyond debate to every reasonable officer in Deputy Cable's position that he was constitutionally

prohibited from using the particular force he employed to secure Mr. Thomas's hands behind

him to enable officers to return him to his cell.

To begin with, such force cannot plausibly be construed as merely "gratuitous," which is

prohibited by the Constitution, nor can it be said to remotely approach the level of "banging

[Plaintiff's] head into the wall and hitting him with enough force to break his ribs" or tasing

him—levels of force which might also have violated Constitution under the circumstances here.

*See Nosewicz*, 754 F. App'x at 734; *see also Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665

(10th Cir. 2010) (use of taser unconstitutional where jury could "conclude that [the victim] did

not pose an immediate threat" to officer or others and where victim was not actively resisting).

But Deputy Cable's actions were well shy of these lines. Neither did he employ any force when

Mr. Thomas was on the ground because, as Mr. Thomas alleges, he was never on the ground. *See*

Am. Compl. at 8 (speculating that Cable was "trying" to get him to the ground); *cf. Weigel v.

Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) (finding that it was "clearly established that putting

substantial or significant pressure on a suspect's back while that suspect is in a face-down prone

position after being subdued and/or incapacitated constitutes excessive force") (quotation

omitted).

With regard to the particular manner in which Plaintiff's hands were secured—which he

dubs a "chicken-wing" maneuver—the court has located no precedent in the Tenth Circuit (or

elsewhere) that renders this tactic per se unconstitutional. Neither has the court found any case

law clearly forbidding Deputy Cable from taking the actions he did in the tense and unexpected

circumstances he faced, prompted by an inmate's sudden refusal to obey an order to return to his

cell while sitting in an open area of a housing unit. *See Kingsley*, 576 U.S. at 399 (objective

reasonableness standard "protects an officer who acts in good faith," and who is "often forced to

make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving").

This court, then, has identified no case that would have put "*every reasonable* official" in

Deputy Cable's position on notice, "beyond debate," that the Constitution prohibited him from

taking the actions Mr. Thomas challenges here. *See al-Kidd*, 563 U.S. at 741 (emphasis added).

He is entitled to qualified immunity for this additional reason.

Accordingly, the court respectfully **RECOMMENDS** that Claim One be **dismissed with

prejudice** because Deputy Cable is entitled to qualified immunity.[7]

### C.    Claim Two: Deliberate Indifference to Medical Needs

In Claim Two, Mr. Thomas alleges that, after the use of force, he suffered "excruciating

and unbearable" pain, prompting him to hit his emergency call button "many times." Am.

Compl. at 9. It allegedly fell to Deputy Cable alone to respond to Mr. Thomas's calls. *Id.* In

---

[7] *See, e.g.*, *Clark v. Wilson*, 625 F.3d 686, 692 (10th Cir. 2010 (instructing district court to
dismiss based on qualified immunity "with prejudice"); *Lybrook v. Members of the Farmington
Mun. Schs. Bd. of Educ.*, 232 F.3d 1334, 1341 (10th Cir. 2000) (affirming district court order
granting motion to dismiss with prejudice on qualified immunity grounds); *Vreeland v. Olson*,
No. 20-cv-02330-PAB-SKC, 2021 WL 4237269, at *5 n.7 (D. Colo. Sept. 16, 2021) ("The Court
will dismiss the claim against Olson and Reed [brought by a pro se plaintiff] with prejudice
because they are entitled to qualified immunity."); *McCrary v. Jones*, No. CIV-13-573-M, 2015
WL 873641, at *1, 6 (W.D. Okla. Feb. 27, 2015) (dismissing claim with prejudice where
defendant was entitled to qualified immunity).

response, Deputy Cable denied that Mr. Thomas was having a medical emergency and declared

that he "did not care." *Id.* The court draws from Mr. Thomas's allegations that he was not

evaluated by any medical personnel on the day of the use-of-force incident.

### 1. Legal Standards for Deliberate Indifference

A prison official's deliberate indifference to a prisoner's serious medical needs violates

the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *accord Farmer v. Brennan*,

511 U.S. 825, 828 (1994). For pretrial detainees, like Plaintiff here, the Constitution provides

similar protections, albeit with a different source—the Fourteenth Amendment. *See Burke v.

Regalado*, 935 F.3d 960, 991 (10th Cir. 2019). But the standards for evaluating deliberate

indifference are the same, whether the constitutional underpinning for the claim is the Eighth or

Fourteenth Amendment. *See, e.g.*, *George, on behalf of Bradshaw v. Beaver Cnty., by & through

Beaver Cnty. Bd. of Comm'rs*, 32 F.4th 1246, 1255-56 (10th Cir. 2022) ("The Fourteenth

Amendment's due-process clause provides pretrial detainees the same protection for medical

attention as convicted inmates receive under the Eighth Amendment.").

To establish deliberate indifference to medical needs, a plaintiff must plead non-

conclusory facts that plausibly support both an objective component and a subjective component.

*Requena v. Roberts*, 893 F.3d 1195, 1215 (10th Cir. 2018). That is, the well-pleaded facts must

allow the court to reasonably infer that a defendant was "subjectively aware" of an objectively

serious medical need and "recklessly disregarded that risk." *Wilson v. Falk*, 877 F.3d 1204, 1209

(10th Cir. 2017) (cleaned up).

Under the objective component, a plaintiff must show he experienced "sufficiently

serious" harm. *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005) (quoting *Farmer*, 511 U.S.

at 834 (internal quotation marks omitted)). A plaintiff's medical need meets this threshold if "it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018) (cleaned up). A showing of "lifelong handicap, permanent loss, or considerable pain" may satisfy the substantial harm requirement. *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001).

As for the subjective prong, a plaintiff must plead facts showing that a defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Walker v. Mohiuddin*, 947 F.3d 1244, 1249 (10th Cir. 2020) (quoting *Farmer*, 511 U.S. at 837). Put another way, "[t]he subjective component is akin to recklessness in the criminal law, where, to act recklessly, a person must 'consciously disregard' a substantial risk of serious harm." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer*, 511 U.S. at 837, 839). "The subjective prong is met if prison officials intentionally deny or delay access to medical care or intentionally interfere with the treatment once prescribed." *Redmond*, 882 F.3d at 940 (cleaned up). "The fact that a serious medical need was 'obvious' could be evidence of deliberate indifference, although a 'prison official may show that the obvious escaped him' and avoid liability." *Self*, 439 F.3d at 1231 (quoting *Farmer*, 511 U.S. at 843 n.8).

### 2.    Application of the Deliberate Indifference Standard

#### a.    Violation of a Constitutional Right

Deputy Cable argues that Mr. Thomas's pleading fails the objective component because

he has not alleged that, as a layperson, Deputy Cable "should have easily recognized Plaintiff's
need for immediate medical attention." Motion at 8. Deputy Cable notes that certain factual
specifics are lacking in the pleading, including "what [Plaintiff's] issues were, what he told
Deputy Cable, or how that information would have risen to the level of needing immediate
attention by medical personnel." *Id.* The court respectfully finds that Deputy Cable does not give
the full credit to Mr. Thomas's allegations that they deserve at this stage of the case.

Mr. Thomas alleges that, in connection with his hands being secured behind his back, he
heard a "pop"—which triggered corresponding pain in one of his arms—and that one of his toes
was "busted" when he was put in the cell. Am. Compl. at 8. He asserts that he had "excruciating
and unbearable" pain in the aftermath of the use of force, which he conveyed to Deputy Cable
when the deputy responded to his calls. *Id.* at 9 (Thomas told Cable "my issues and every time he
[chose] to ignore them"). Mr. Thomas further asserts that he has since suffered "severe constant
pain and possibly permanent muscle and nerve damage." *Id.* at 8. Importantly, "it is the harm
claimed by the prisoner that must be sufficiently serious to satisfy the objective component, and
not solely 'the symptoms presented at the time the prison employee has contact with the
prisoner.'" *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Mata*, 427 F.3d
at 753).

Assuming Mr. Thomas's allegations to be true, as the court must in evaluating a motion
to dismiss, he sufficiently alleges the existence of an objectively serious harm so as to satisfy the
objective component of the deliberate indifference test.

Turning then to the subjective prong, Deputy Cable urges that the allegations do not
support an inference that he "would have easily recognized the need for medical attention,"

Motion at 8, but here again, Deputy Cable's argument does not meaningfully engage with the well-pleaded facts. Mr. Thomas avers that, in seeking medical attention for severe pain, he repeatedly pressed his call button and repeatedly told Deputy Cable what he was experiencing. If these had been completely "cold" calls, from a prisoner with whom Deputy Cable had not had immediate prior contact, his assertion that the allegations do not plausibly demonstrate an appreciation of a substantial risk of serious harm might be more compelling. But the well-pleaded facts reveal a context that plausibly establishes Deputy Cable's knowledge: he knew that a use-of-force incident had just occurred, and he knew the type of force the deputies employed in regaining control over Mr. Thomas—specifically, he knew that Mr. Thomas's arms were forcibly placed behind him because Deputy Cable himself so placed them.

Under these circumstances, Mr. Thomas's reports of severe pain in his arm—attendant on a "pop," which could plausibly indicate a dislocation—were, at the very least, plausible. Yet rather than take any measure to address this potential medical issue, Deputy Cable said that he "did not care" and ignored Mr. Thomas's requests for medical attention. Months later, Mr. Thomas continues to suffer from severe pain. Assuming that Mr. Thomas's telling of the events is true, he has sufficiently alleged that Deputy Cable knew of a serious risk of harm to him at the time Mr. Thomas was pressing the emergency call button and consciously disregarded that risk. *See, e.g.*, *Havens v. Clements*, No. 13-cv-00452-MSK-MEH, 2014 WL 1213804, at *17 (D. Colo. Mar. 24, 2014) (allegations that plaintiff pressed the nurses' call button several times repeatedly and was required to wait several hours for help were sufficient to allege that defendants knew of and disregarded a substantial risk to the plaintiff's health); *Al-Turki v. Robinson*, 762 F.3d 1188, 1194 (10th Cir. 2014) (affirming denial of qualified immunity where

the defendants allegedly ignored repeated calls for help from inmate who they knew was experiencing severe abdominal pain).

For these reasons, the court finds that the Amended Complaint sufficiently alleges a deliberate indifference claim against Deputy Cable.

### b.    Clearly Established Law

Turning then to the clearly established law prong of the qualified immunity inquiry, the court begins by focusing on the essence of Mr. Thomas's deliberate indifference claim: that Deputy Cable exhibited deliberate indifference by failing to respond in a meaningful way to his sounding the emergency call button and repeatedly seeking medical assistance, thus subjecting him to extended severe pain. "Tenth Circuit case law consistently instructs that 'when [an inmate] has obvious and serious medical needs, ignoring those needs necessarily violates the [inmate's] constitutional rights,' *Quintana* [*v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1030, 1033 (10th Cir. 2020)], and further has regularly advised that a delay in providing medical care may "constitute[ ] an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Est. of Kowalski v. Shrader*, No. 21-cv-00827-NYW, 2022 WL 19422, at *12 (D. Colo. Jan. 3, 2022) (quoting *Mata*, 427 F.3d at 751; citing inter alia *Al-Turki*, 762 F.3d at 1194 (the defendant's "choice to ignore the repeated requests for medical help from an inmate who was experiencing severe abdominal pain potentially caused by a life-threatening condition [] would constitute a violation of the Eighth Amendment")).

The constitutional rule that a decision to ignore or delay treatment for a prisoner's complaints of severe pain may violate that person's constitutional rights was clearly established on March 19, 2023. *Kowalski*, 2022 WL 19422, at *10, 14 (denying qualified immunity on a

motion to dismiss where prison personnel were alleged to have been near an inmate's cell "and

saw and heard the emergency call button 'continually alarming,'" and "were close enough to

hear [his cellmate] yelling for help and close enough to see [the cellmate's] face through the cell

door"); *Al-Turki*, 762 F.3d at 1191 (prison nurse found not entitled to qualified immunity where

she was specifically made aware that prisoner was experiencing severe abdominal pain that "may

be a symptom of several serious and potentially life-threatening conditions," but responded that

"she would not see Plaintiff because it was too late and because Plaintiff's complaint was not an

emergency"). Taking the facts here in the light most favorable to Mr. Thomas, the right at issue,

as alleged in the Amended Complaint, was clearly established at the time of Deputy Cable's

actions, which can be said to fall within this clearly established law. To be sure, Deputy Cable is

a layperson and not a medical professional, but he both heard Mr. Thomas's complaints and,

with knowledge of a potential physical cause for that alleged pain, refused to respond.

For these reasons, the court cannot conclude—at the pleading stage[8]—that Deputy Cable

is entitled to qualified immunity with respect to Mr. Thomas's deliberate indifference claim. The

court, therefore, respectfully **RECOMMENDS** that the Motion, insofar as it seeks dismissal of

Claim Two, be **denied without prejudice** to Deputy Cable's right to reraise qualified immunity

at a later stage in the proceeding if discovery supports that defense.

---

[8] The court recognizes that a fuller record on summary judgment—which likely would include
evidence such as testimony from Deputy Cable, information from Mr. Thomas's medical records
and possibly surveillance video—may shed a different light on the matter and shift the focus of
the clearly established law inquiry. But the legal framework to which this court must adhere at
the motion to dismiss stage compels the conclusion it has reached here.

## II.     Municipal Liability Claims (Claims Three and Four)

Claims Three and Four raise municipal liability claims against the EPSO Defendants.[9] Fundamentally, Mr. Thomas contends that the EPSO Defendants violated his Fourteenth Amendment due process rights based on a theory of municipal liability for implementing policies and practices that authorize uses of force based on unconstitutional pain-compliance techniques.

As an initial matter, as the court has explained above, the Amended Complaint fails to allege that Deputy Cable violated Mr. Thomas's constitutional rights during the use-of-force incident. Mr. Thomas's failure to allege that any municipal employee violated his constitutional right to free from excessive force requires that the municipal liability claims against the EPSO Defendants be dismissed. *St. George v. City of Lakewood*, No. 22-1333, 2024 WL 3687780, at *4 (10th Cir. Aug. 7, 2024) (affirming dismissal of municipal liability claim because it "require[s] an underlying violation" by an officer); *Nichols v. Bd. of Cnty. Comm'rs of Cnty of Adams*, No. 23-cv-00224-PAB-MEH, 2024 WL 729673, at *17 (D. Colo. Feb. 21, 2024) (dismissing municipal liability claim against city with prejudice where "the complaint fails to allege that Detective Moss or Chief Wilson committed a constitutional violation").

---

[9] This court is uncertain why the individual EPSO Defendants have not sought dismissal of the municipal liability claims against them on grounds that they are duplicative of the claims against the EPSO. It has long been established that, because an official-capacity suit serves to plead a claim against the entity for which the officer is an agent, the entity should be named directly, rather than naming individual officials in their official capacities. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (recognizing that a suit against an individual in his official capacity is really "only another way of pleading an action against an entity of which an officer is an agent ") (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978)). Nevertheless, the court respectfully declines to make arguments that Defendants have not made, and where their strategic purposes may be unclear to the court. *See Perry v. Woodward*, 199 F.3d 1126, 1141 n. 13 (10th Cir. 1999) (court "will not craft a party's arguments for him").

On this basis alone, the court is able to recommend that Claims Three and Four be dismissed. However, because this is a recommendation, and to ensure a full record for Chief Judge Brimmer's consideration, the court proceeds to further evaluate the municipal liability claims and finds that additional pleading deficiencies require their dismissal.

### A.    Legal Standard for Municipal Liability

"Municipal liability is also known as *Monell* liability, after *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 [ ] (1978)." *Arnold v. City of Olathe*, 35 F.4th 778, 795 n.4 (10th Cir. 2022). Crucially, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694. Put another way, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. A local government unit instead may be liable for damages under 42 U.S.C. § 1983 only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]" *Id.*

A municipal policy or custom may take one of the following forms:

(1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks and brackets omitted). Whatever the type of policy or custom alleged, "[t]he plaintiff must also

demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind

the injury alleged. That is, a plaintiff must show that the municipal action was taken with the

requisite degree of culpability and must demonstrate a direct causal link between the municipal

action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v.*

*Brown*, 520 U.S. 397, 404 (1997) (emphasis in original); *see also Waller v. City & Cnty. of*

*Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) ("In addition to the failure to train and to

supervise, other alleged supervisory shortcomings—for instance, failing to adequately screen job

applicants—can also constitute an official policy if the plaintiff meets the stringent 'deliberate

indifference' standard of fault.") (citing *Bryan Cnty.*, 520 U.S. at 410; *Dodds v. Richardson*,

614 F.3d 1185, 1212 (10th Cir. 2010) (Tymkovich, J., concurring)).

        "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal

actor disregarded a known or obvious consequence of his action, as a less stringent standard of

fault . . . would result in *de facto respondeat superior* liability on municipalities." *Waller*,

932 F.3d at 1284 (quoting *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011) (cleaned up)). "The

deliberate indifference standard may be satisfied when the municipality has actual or

constructive notice that its action or failure to act is substantially certain to result in a

constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."

*Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). Notice requires "a pattern of tortious

conduct." *Id.* And so deliberate indifference "may be found absent a pattern of unconstitutional

behavior" only in "a 'narrow range of circumstances,'" where "a violation of federal rights is a

'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction." *Id.*

at 1307-08 (quoting *Bryan Cnty.*, 520 U.S. at 409).

Read liberally, Mr. Thomas's pleading attempts to assert municipal liability on four theories: that EPSO maintains an informal custom approving the use of excessive force by the utilization of "pain for compliance" techniques,[10] failure to train, failure to supervise, and failure to investigate. *See generally* Am. Compl. at 10-11. For the reasons that follow, the court respectfully finds that Plaintiff's allegations are insufficient plausibly to establish municipal liability under any of those theories.

### B. Plaintiff's Theories of Municipal Liability

#### 1. Unwritten Policy of Tolerating Pain-Compliance/Excessive Force

"[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bryan Cnty.*, 520 U.S. at 404; *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "With informal, unwritten policies, customs, or practices, the plaintiff can plead a pattern of multiple similar instances of misconduct; 'no set number is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible.'" *Arakji v. Hess*, No. 15-cv-00681-CMA, 2015 WL 7755975, at *6 (D. Colo. Dec. 2, 2015) (quoting *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015)).

Mr. Thomas contends that EPSO maintains a custom of utilizing pain-compliance

---

[10] The court does not construe the pleading as alleging that there is a formal EPSO policy on this topic. The court understands Mr. Thomas's use of the term "pain for compliance" to refer to the more commonly-used term "pain compliance."

techniques that have "cause[d] serious injuries to many other inmates at CJC." Am. Compl.
at 10. He points to four examples. *Id.* (referencing inmates Roquemore, Eaves, Rosa, and Henry).

As a preliminary matter, that small number is insufficient to plausibly demonstrate the
existence of a *widespread* practice, as required to state a *Monell* claim based on an informal
custom. *Bryson*, 627 F.3d at 788. *See also, e.g.*, *Waller*, 932 F.3d at 1287 (observing that one
similar prior incident "does not describe a pattern of violations") (quoting *Coffey v. McKinley
Cnty.*, 504 F. App'x 715, 719 (10th Cir. 2013); citing *Martin v. Malhoyt*, 830 F.2d 237, 255 (D.C.
Cir. 1987) ("One instance, however egregious, does not a pattern or practice make.")); *see also
Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 774 (10th Cir. 2013) (finding
that "one other report of non-consensual sexual misconduct" involving a different officer was
"not enough to make it obvious to [the police department] that officers were likely to engage in
non-consensual sexual conduct"); *Lucio-Vasquez v. City of Aurora*, No. 21-cv-2756-WJM-MDB,
2023 WL 2891009, at *9 (D. Colo. Apr. 11, 2023) (two similar prior instances of excessive force
"is simply not enough to show that [defendant] has a practice that is 'so widespread as to have
the force of law'") (quoting *Bryan Cnty.*, 520 U.S. at 404; citing *Waller*, 932 F.3d at 1290)); *cf.
Andersen v. City of Colo. Springs*, No. 20-cv-02032-RBJ, 2021 WL 8444657, at *4 (D. Colo.
Aug. 12, 2021) (eight examples of purportedly unlawful arrests "could indicate that Colorado
Springs has an informal custom permitting its officers to arrest and detain individuals without a
lawful basis for doing do").

But even if the court were to assume that only four supposedly similar instances would
not, in and of itself, preclude a finding of a "pattern of unconstitutional behavior," *see Barney*,
143 F.3d at 1308, this court nevertheless concludes that Mr. Thomas's allegations fail to show the

existence of a "widespread practice "that is "so permanent and well settled" so as to constitute a custom with the force of law. *Bryson*, 627 F.3d at 788. He pleads no factual specifics that explain how these exemplars plausibly indicate the existence of a practice of improper utilization of pain-compliance techniques at the CJC. Neither has this court's research concerning these individuals—which, the court emphasizes, it was not obliged to undertake—unearthed any information that would plausibly support such an inference. The uses of forces at issue in those cases bear little similarly to the use of force against Mr. Thomas at issue here.

The case brought by inmate Roquemore is currently pending a recommendation to dismiss the municipal liability claim. *Roquemore v. El Paso Cnty., Colo., et al.*, No. 23-cv-00072-NYW-SBP (D. Colo.), ECF No. 137. Roquemore alleged a wholly gratuitous beating, in which a CJC deputy punched him in the face multiple times—not injury stemming from the application of a pain-compliance technique designed to regain control over a disruptive inmate. *See id*. With regard to Eaves, the court has located a case in which a person by that name alleged that El Paso County maintained "an informal custom, policy, or practice of excessive force in CJC and a failure to train or discipline the deputies," based on allegations that deputies repeatedly smashed his head against the floor and struck him in the head, among other overtly assaultive behaviors. *Eaves v. El Paso Cnty.*, No. 16-cv-01065-KLM, 2021 WL 5037485, at *1 (D. Colo. Oct. 19, 2021) (order denying defendants' motion for summary judgment). That case, which seemingly had nothing to do with the utilization of "pain-compliance" techniques, was settled without being tried to verdict and stemmed from an incident that occurred in April 2015, more than eight years before the incident at issue here. *See id.*

Neither is a pattern of unconstitutional use of pain-compliance techniques plausibly

supported by the Rosa example. Rosa alleged that two CJC deputies assaulted him without provocation while he was talking with another inmate. *Rosa v. McAllister*, No. 23-cv-00983-GPG-KAS, 2024 WL 3859945, at *1 (D. Colo. Aug. 19, 2024) (recommendation to grant in part and deny in part Defendants' motion to dismiss) (describing unprovoked attack involving pushing, shoving, and punching).[11] Notably, too, the incident in *Rosa* occurred in April 2023, *after* the March 19, 2023 incident at issue here, and so cannot show that the EPSO Defendants acted with deliberate disregard of a risk that was known or obvious at the time of the alleged assault against Mr. Thomas. *See, e.g.*, *Waller*, 932 F.3d at 1286 (finding, in affirming dismissal of a municipal liability claim on a Rule 12(b)(6) motion, that "[i]ncidents that occurred subsequent to the incident at issue in this case cannot have provided Denver with notice of a deficiency in its training program before that incident, and thus they cannot be used as evidence that, prior to Deputy Lovingier's use of force against Mr. Waller, Denver 'decisionmakers . . . deliberately chose[ ] a training program that w[ould] cause violations of constitutional rights") (quoting *Connick*, 563 U.S. at 62, 64 (noting that deliberate indifference generally requires "proof of a *pre-existing* pattern of violations") (emphasis in original)); *Kowalski*, 2022 WL 19422, at *20 (observing that "[t]he *Waller* court ultimately considered only events pre-dating the alleged constitutional violation in analyzing whether the plaintiff had raised sufficient allegations of a widespread informal custom") (citing *Waller*, 932 F.3d at 1290; emphasis in original).

Finally, as for the exemplar inmate named Henry, information available in the records of this court indicates that a person by that name filed an action in which they claim to have been assaulted "while sleeping in the back of squad car in the garage of CJC." *See Rocquemore*, ECF

---

[11] There is no reference to a *Monell* claim in the recommendation in *Rosa*.

No. 86 at 10.[12] That situation, obviously, did not involve the use of a "pain-compliance"

technique or an inmate who (unlike Mr. Thomas) had refused to obey a direct order issued by a

CJC officer.

At bottom, Mr. Thomas's allegations are insufficient to demonstrate a "widespread

practice" of regularly employing excessive force by means of allegedly improper pain-

compliance techniques—or, indeed, improper excessive force premised on any constitutional

flaw—that is causally connected to the injury he claims. *Bryson*, 627 F.3d at 788. Neither do his

allegations plausibly establish the existence of an informal custom "enacted or maintained with

deliberate indifference to an almost inevitable constitutional injury." *Schneider*, 717 F.3d at 769.

The court thus concludes that Mr. Thomas has not met his pleading burden so as to state a

*Monell* claim grounded on an unofficial-custom-or-practice theory.

### B.    Failure to Train and Supervise

Mr. Thomas also asserts—albeit in the most cursory fashion—that his municipal liability

claims are based on purported deficiencies in training and supervision. He maintains that "[a]ll

defendants . . . are liable for enacting, enforcing and training employees in pain for compliance

techniques," and that Defendants Carnell, Wheeler, and Davis violated his rights under the

Fourteenth Amendment for "failure to train/supervise." Am. Compl. at 11. The EPSO Defendants

argue that Mr. Thomas's allegations are insufficient to proceed on either theory because he "has

not plausibly alleged a systemic inadequacy in the overall training of EPSO officers in proper use

---

[12] A lawsuit brought by an individual named Darren Henry (a/k/a/ Ashleigh Henry and Ashleigh
Vanity Chae) was dismissed without prejudice for lack of prosecution on April 3, 2024. *Henry v.
El Paso Cnty, Colo., Sheriff's Office, et al.*, No. 23-cv-01808-NYW-SBP (D. Colo.).

of force, nor has he provided adequate facts to allege that Deputy Cable has a repeated history of excessive use of force." Motion at 11.

The court's analysis begins by recognizing that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61; *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*."). When a *Monell* claim is based on an alleged failure to train, the plaintiff's allegations must "reflect[ ] a 'deliberate' or 'conscious' choice by a [government entity]." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).

As discussed above, deliberate indifference is a stringent standard that requires a finding that "the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney*, 143 F.3d at 1307. "Policymakers' 'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Connick*, 563 U.S. at 62 (quoting *Bryan Cnty.*, 520 U.S. at 407). But "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* As Chief Judge Brimmer has put it, "*[n]otice of particular deficiencies* in a training program is the crux of a failure-to-train theory[.]" *Est. of Lobato v. Correct Care Sols., LLC*, No. 15-cv-02718-PAB-STV, 2017 WL 1197295, at *7 (D. Colo. Mar. 31, 2017) (emphasis added). And "[a] pattern of similar

constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quoting *Bryan Cnty.*, 520 U.S. at 409).

In this instance, as discussed above, the Amended Complaint does not sufficiently allege a pattern of similar constitutional violations that would have put the EPSO Defendants on notice of any particular deficiency in training policies for CDC deputies. The few incidents delineated in the pleading fail to plausibly demonstrate that these Defendants were on notice of a "pattern of similar constitutional violations" in March 2023, *see Waller*, 932 F.3d at 1285, or that they had reason to be cognizant of the need for more or different training policies with respect to the utilization of "pain-compliance" techniques--or, for that matter, uses of force in general.

Neither do Mr. Thomas's extremely minimal allegations regarding training suffice to show that "the need for more or different training" regarding the supposed wrong-headedness of certain "pain-compliance" techniques was "so obvious, and the inadequacy of the County's training so likely to result in the violation of constitutional rights, that the policymakers of the [County] can reasonably be said to have been deliberately indifferent to the need." *Schneider*, 717 F.3d at 773 (quoting *City of Canton*, 489 U.S. at 390). Indeed, the court can derive no inference from the well-pleaded facts that EPSO policymakers had any reason to be aware of any improper utilization or application of pain-compliance techniques, under any circumstances, prior to the accusations Mr. Thomas made against Deputy Cable. Neither may any inference of deliberate inference to the need for more or different training be drawn from the allegations here, which are based on defects in the actions of one particular officer—who, as this court has noted, is entitled to qualified immunity on Mr. Thomas's excessive force claim. Even setting the

qualified immunity determination aside, the fact "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390-91.

Here, there is no plausible basis upon which to fasten any shortcomings that Deputy Cable may have exhibited in his response to Mr. Thomas's disorderly behavior on the EPSO training program for its deputies. And having failed to allege any deficiency in the EPSO training program, it goes without saying that Mr. Thomas likewise has not alleged that any such hypothetical deficiency is "closely related to the ultimate injury" he claims to have sustained. *Id.* at 391. In short, Mr. Thomas's allegations are insufficient to state a claim based on a failure-to-train theory of municipal liability.

The paucity of facts compels the court to reach the same conclusion regarding Mr. Thomas's failure-to-supervise theory of liability. His sole allegation—the bare assertion that there was a failure to supervise, Am. Compl. at 11—is wholly conclusory. He has not alleged "any *facts* regarding any supposed supervisory deficiencies" in the CJC—"much less any facts describing how" that purportedly inadequate supervision caused his injury here. *Waller*, 932 F.3d at 1289 (emphasis added). He has not stated a claim based on a failure-to-supervise theory of liability that is plausible on its face. *See Twombly*, 550 U.S. at 570.

### C.    Failure to Investigate[13]

Mr. Thomas's failure-to-investigate theory of municipal liability similarly lacks sufficient

---

[13] As one judge in this District has recognized, "[a] failure-to-investigate/discipline claim usually falls under the failure-to-train rubric." *Valdez v. Motyka*, No. 15-cv-0109-WJM-STV, 2020 WL

factual support so as to state a colorable *Monell* claim on that basis.

Mr. Thomas alleges that his grievances related to the March 19, 2023 incident were uniformly denied and thus, by definition, were not properly investigated. "If anyone had taken the time to thoroughly investigate my grievances," he contends, "it would have been obvious that my rights were violated." Am. Compl. at 11. And so he would impose liability on the EPSO Defendants because Carnell, Wheeler, and Davis were "grossly negligent in regards to the grievance process which has denied me [and] many inmates' remedy." *Id.*[14]

Accepting these allegations as true, the court cannot plausibly infer the existence of a widespread practice of investigational deficiencies that are "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691. The solitary reference to Mr. Thomas's own case hardly reflects a "custom or usage" of that magnitude, and his unadorned allegation that the grievances of "many [unidentified] inmates" likewise permits no inference that the EPSO defendants have an ingrained practice of not investigating uses of force involving pain-compliance techniques (or uses of force more generally). At bottom, what Mr. Thomas has alleged here is that he thinks the investigating officials should have reached a different conclusion about his grievances concerning the March 19, 2023 incident. But his disagreement is insufficient to plausibly indicate some permanent, widespread defect "with the

---

3963717, at *2 n.2 (D. Colo. July 13, 2020) (citing *Trujillo v. City & Cnty. of Denver*, No. 16-cv-01747-WJM-MJW, 2017 WL 1364691, at *4 (D. Colo. Apr. 14, 2017)). In deference to Mr. Thomas's pro se status, however, the court will separately analyze whether he has plausibly alleged a *Monell* claim based on allegations of failure to investigate.

[14] Mr. Thomas, of course, has no independent constitutional right to an adequate grievance procedure. *See, e.g.*, *Burnett v. Allbaugh*, 715 F. App'x 848, 852 (10th Cir. 2017) (collecting cases).

force of law" in the investigatory process, which is required for municipal liability to attach.
Neither do Mr. Thomas's allegations on the failure-to-investigate point allow the court to infer a
"direct causal link" between the mode of investigation employed and a deprivation of his federal
rights—particularly if some of the investigations to which he refers occurred after the incident
involving him. *See Bryan Cnty.*, 520 U.S. at 404; *see also Cordova v. Aragon*, 569 F.3d 1183,
1190 (10th Cir. 2009) (observing that "basic princip[les] of linear time prevent us from seeing
how conduct that occurs *after* the alleged violation could have somehow caused that violation")
(emphasis in original); *Waller*, 932 F.3d at 1289 (quoting *Cordova*'s linearity principle in
discussion of plausibility of failure-to-investigate claim).

This court therefore finds that Mr. Thomas has not plausibly alleged that he was injured
by any municipal failure to properly investigate claims that excessive force was deployed in
utilizing pain-compliance techniques—or in any uses of force.

*    *    *

In sum, Mr. Thomas failed to state a municipal liability claim that is plausible on its face.
Accordingly, this court respectfully **RECOMMENDS** that Claims Three and Four be **dismissed**
**without prejudice**. *See, e.g.*, *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010 (recognizing
that "ordinarily the dismissal of a pro se claim under Rule 12(b)(6) should be without prejudice")
(citing *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001)).

**CONCLUSION**

Consistent with the foregoing, the court respectfully **RECOMMENDS** that the Motion to
Dismiss (ECF No. 23), be **granted in part and denied in part** as follows:

(1) That the Motion be **granted** insofar as it seeks dismissal of Claim One, the excessive

force claim against Defendant Cable, which the court recommends be **dismissed with prejudice** because he is entitled to qualified immunity;

(2) That the Motion be **granted** insofar as it seeks dismissal of Claims Three and Four, the municipal liability claims against the EPSO Defendants, which the court recommends be **dismissed without prejudice**; and

(3) That the Motion be **denied** insofar as it seeks dismissal of Claim Two, the deliberate indifference to medical needs claim against Defendant Cable.[15]

This court will conduct a preliminary Scheduling Conference to set a discovery schedule for the remaining claims, if any, on Wednesday, October 23, 2024, at 1:30 p.m.

---

[15] Rule 72 of the Federal Rules of Civil Procedure provides that within fourteen (14) days after service of a Magistrate Judge's order or recommendation, any party may serve and file written objections with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. §§ 636(b)(1)(A), (B); Fed. R. Civ. P. 72(a), (b). Failure to make any such objection will result in a waiver of the right to appeal the Magistrate Judge's order or recommendation. *See Sinclair Wyo. Ref. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 783 (10th Cir. 2021) (firm waiver rule applies to non-dispositive orders); *but see Morales-Fernandez v. INS*, 418 F.3d 1116, 1119, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review, including when a "pro se litigant has not been informed of the time period for objecting and the consequences of failing to object").

DATED: September 3, 2024                    BY THE COURT:

_____
Susan Prose
United States Magistrate Judge